IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

v.  CRIMINAL ACTION NO. 2:17-cr-00047

DANA STEVENSON

MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

On June 26, 2017, I rejected the proffered plea agreement in *United States v. Charles York Walker, Jr.* after determining that it was not in the public interest.[1] On October 10, 2017, I rejected the proffered plea agreement in *United States v. Antoine Dericus Wilmore* after determining that it also was not in the public interest.[2] In both opinions, I stated that it is the court's function to prevent the transfer of criminal adjudications from the public arena to the prosecutor's office for the purpose of expediency at the price of confidence in and effectiveness of the criminal justice system.

I have further reflected upon the near-total substitution of plea bargaining for the system of justice created by our nation's Founders, and I **FIND** that I should give great weight to the people's interest in participating in their criminal justice system

---

[1] *United States v. Walker*, No. 2:17-cr-10, 2017 WL 2766452 (S.D. W. Va. June 26, 2017).
[2] *United States v. Wilmore*, 282 F. Supp. 3d 937 (S.D. W. Va. 2017).

when considering whether to accept or reject a proffered plea bargain in a particular case. I **FIND** that the scales of justice tip in favor of rejecting plea bargains unless I am presented with a counterbalance of case-specific factors sufficiently compelling to overcome the people's interest in participating in the criminal justice system.

Therefore, in each case, I will consider the case-specific factors presented to me and weigh those competing factors against the people's participatory interest and then determine whether to accept or reject the plea bargain. Because I **FIND** that the presented justifications for the bargain in this case are insufficient to balance the people's interest in participating in the criminal justice system, I **REJECT** the proffered plea agreement.

## II. BACKGROUND

On March 21, 2017, a federal grand jury in Charleston, West Virginia returned a seven-count indictment against the defendant, Dana Stevenson.[3] Counts One, Two, Three, Four, and Five allege five separate sales of heroin by the defendant, two of which are alleged to have occurred within one thousand feet of Stonewall Jackson Middle School.[4] Count Six alleges that the defendant possessed with the intent to distribute crack cocaine, and Count Seven alleges that the defendant illegally possessed a firearm, having been convicted of a prior felony offense.[5]

The government and the defendant entered into a plea agreement.[6] The defendant agreed to plead guilty to Count One of the Indictment, charging him with

---

[3] Indictment [ECF No. 1].
[4] *Id.*
[5] *Id.*
[6] Plea Agreement [ECF No. 27].

2

distributing heroin in violation of 21 U.S.C. § 841(a)(1).[7] In exchange, the government agreed to dismiss Counts Two, Three, Four, Five, Six, and Seven after the defendant has been convicted and sentenced on Count One.[8] The plea agreement also contains a Stipulation of Facts wherein the defendant admits to conduct comprising the offenses alleged in Counts Two through Seven of the Indictment.[9]

On October 18, 2017, the defendant appeared before the Honorable Thomas E. Johnston, Chief Judge of the United States District Court for the Southern District of West Virginia, to enter a plea of guilty to Count One of the Indictment.[10] Judge Johnston accepted the defendant's guilty plea but deferred adjudicating the defendant guilty until sentencing.[11] On January 24, 2018, the case was reassigned from Judge Johnston to me.[12] On January 25, 2018, I directed the government to brief the *Walker* factors,[13] and I recommended the defendant do the same.[14] Both parties submitted those briefs.[15] I must now decide to accept or reject the plea agreement proffered in this case.

### III. DISCUSSION

Expanding on the *Walker* opinion in *Wilmore*,[16] I examined a variety of interests that the people have in the criminal jury trial. Foremost, I explained that

---

[7] *Id.* at 2.
[8] *Id.*
[9] Plea Agreement Ex. A [ECF No. 27].
[10] Plea Hr'g [ECF No. 24]; Written Plea [ECF No. 26].
[11] Plea Hr'g.
[12] Clerk's Order [ECF No. 32].
[13] *See Walker*, 2017 WL 2766452, at *12.
[14] Order [ECF No. 34].
[15] Resp. of United States [ECF No. 35]; Mem. by Dana Stevenson [ECF No. 36].
[16] *Wilmore*, 282 F. Supp. 3d at 941–47.

3

because this is a government "of the people, by the people, for the people,"[17] the people have an interest in participating in their criminal justice system.[18] I also observed that the criminal jury trial (1) plays an important role in maintaining the appropriate separation of powers between the three branches of government,[19] (2) creates an educated populace that respects the law and has faith in the criminal justice system,[20] and (3) provides an appropriate forum for the community to peacefully express its outrage at arbitrary government action as well as vicious criminal acts.[21]

I will now explain why I have concluded that the people's participation in their criminal justice system is of paramount importance when I consider whether to accept or reject a plea bargain presented to me.

### a. Foundational Principles

One of the fundamental principles underlying the Constitution was the people's intent to establish a participatory democracy respecting the natural rights of the people.[22] Natural rights, including the rights to life, liberty, the pursuit of

---

[17] Abraham Lincoln, The Gettysburg Address (Nov. 19, 1863).
[18] *Wilmore*, 282 F. Supp. 3d at 943.
[19] *Id.* at 944.
[20] *Id.* at 945–46.
[21] *Id.* at 945.
[22]     To establish a civil government, the people give up some of their natural rights in order to endow a central authority with the power to protect the people's remaining natural rights. *See* Philip A. Hamburger, *Natural Rights, Natural Law, and American Constitutions*, 102 Yale L.J. 907, 930–31 (1993). Establishing a civil government requires the people to relinquish some of their natural liberty, but by making this sacrifice, their remaining natural liberty is thereby protected from infringement. This is often accomplished by means of a constitution. *See id.* at 931.
        Constitutions play an important role in defining the limits of the government's authority by establishing which natural rights are protected from the government itself. By granting the government authority to protect the people's remaining natural rights, "there was a danger that government could limit natural liberty more than was necessary for this purpose and that government might thereby become a threat to the very natural liberty it was designed to secure." *Id.* This is why constitutions regularly state which natural rights are relinquished to establish the government and which natural rights are preserved. The natural rights that are preserved are those that the people consider unalienable. *See id.* at 931–32.

happiness, property, religion, free speech, and free press,[23] were considered so important that they were regularly described as unalienable,[24] i.e., even acting truly voluntarily, an individual could not give them away.[25] It was the people's natural rights that the government was created to protect as well as to respect.

In order to ensure that the government respected the people's natural rights to life and liberty, the people reserved a place for their participation in the criminal justice system.[26] Such participation was constitutionally established through the people's participation in the grand jury and in the criminal jury trial. Because the grand jury begins the criminal case, I will begin my discussion of the importance of the people's participation with the grand jury.

### b. The Importance of the Grand Jury

The people created a bulwark[27] against tyranny and the arbitrary exercise of government power in the criminal justice system by establishing the grand jury as an integral part of criminal procedure. A prosecutor cannot compel an individual to answer accusations of serious, i.e., felony, criminal conduct other than through the

---

[23] *Id.* at 919.
[24] *See* Declaration of Independence para. 2 (U.S. 1776).
[25] *See* Robert Schehr, *The Emperor's New Clothes: Intellectual Dishonesty and the Unconstitutionality of Plea-Bargaining*, 2 Tex. A&M L. Rev. 385, 411 (2015).
[26] The government's power to protect the people's natural rights is derived from the consent of the governed—*the voice of the people themselves. See id.* at 418 ("A constitution that gained its legitimacy and authority from the will of the people as a whole would be expected to express and protect natural rights."). It should come as no surprise that where the government's power is at its zenith, i.e., to deprive individuals of life and liberty, the people took care to establish mechanisms for their direct participation as a check on such exercises of government power.
[27] *See* Roger A. Fairfax, Jr., *Grand Jury Innovation: Toward a Functional Makeover of the Ancient Bulwark of Liberty*, 19 Wm. & Mary Bill Rts. J. 339, 339 (2010) (referring to the grand jury as "the ancient 'bulwark' of liberty").

grand jury indictment.[28] This is because, at the founding, liberty was considered to be such a preeminent value that where it is most seriously threatened, the people withheld from the government the power to compel an individual to answer accusations of a felony crime without their consent.[29] To accuse an individual of a felony crime, the prosecutor has to invoke the people's voice through the grand jury.[30] Thus, once the grand jury returns an indictment, the prosecutor is no longer *entirely* within the realm of his executive authority.[31]

A common view of the grand jury is that it functions to merely check whether the prosecutor has probable cause to believe that an individual has committed the alleged crime.[32] At minimum, such a check protects everyone from inappropriate prosecutorial action, such as harassment or malice, because it prevents the

---

[28] *See* U.S. Const. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . .").
[29] *See* Roger A. Fairfax, Jr., *Grand Jury Discretion and Constitutional Design*, 93 Cornell L. Rev. 703, 730 (2008) ("[N]o prosecution c[an] proceed within the confines of the grand jury's district without its consent.").
[30] *See* Niki Kuckes, *The Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury*, 94 Geo. L.J. 1265, 1300 (2006) ("This suggests that the grand jury is best seen, in the words of Judge Learned Hand, simply as the 'voice of the community accusing its members.'").
[31] Federal Rule of Criminal Procedure 48(a) permits dismissal of indictment, information, or complaint only "by leave of court." "[I]t seems altogether proper to say that the phrase 'by leave of court' in Rule 48(a) was intended to modify and condition the absolute power of the Executive, consistently with the Framer's concept of Separation of Powers, by erecting a check on the abuse of Executive prerogatives." *United States v. Cowan*, 524 F.2d 504, 513 (5th Cir. 1975). While courts have minimal discretion to deny such motions, the prosecutor's discretion to dismiss a charge is still less than absolute once the grand jury has returned a true bill.
[32] *See* Fairfax, *supra* note 29, at 726 ("[T]he modern conception of the grand jury relegates it to a mere probable cause filter for serious criminal charges . . . ."); *see also* Kuckes, *supra* note 30, at 1279–83 (describing this probable cause function as the judicial model of grand jury indictment).

prosecutor from initiating a criminal case where there is insufficient evidence to establish probable cause that the individual has committed the alleged crime.[33]

Beyond an evidentiary gatekeeping function, however, the grand jury plays an additional role in checking government power.[34] One commentator has gone so far as to label the grand jury as a "quasi-legislative body" and "a grassroots political 'fourth branch' of government."[35] This comes from the grand jury's absolute discretion to indict or not indict.[36] "Where the grand jury truly adds value is through its ability to exercise robust discretion not to indict where probable cause nevertheless exists . . . ."[37] As another commentator details, colonial grand juries "did not refuse to indict because of a lack of proof that the accused had violated a criminal statute. Rather, they refused because they fundamentally disagreed with the government's decision to enforce these laws at all."[38]

The grand jury's structural check on the government reaches all three branches of government.[39] With respect to the judiciary, "jurisdiction cannot be exercised in felony and capital cases without the grand jury's consent."[40] With respect

---

[33] *See Wood v. Georgia*, 370 U.S. 375, 390 (1962) ("Historically, t[he grand jury] has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will.").
[34] *See* Kuckes, *supra* note 30, at 1284–89 (describing this additional function as the prosecutorial model of grand jury indictment and noting that the Supreme Court has emphasized the accusatory function of the grand jury over the adjudicatory function of the grand jury).
[35] Josh Bowers, *The Normative Case for Normative Grand Juries*, 47 Wake Forest L. Rev. 319, 324 (2012).
[36] *See id.*
[37] Fairfax, *supra* note 29, at 706.
[38] Ronald F. Wright, *Why Not Administrative Grand Juries?*, 44 Admin. L. Rev. 465, 469 (1992).
[39] *See* Kuckes, *supra* note 30, at 1307 ("Citizens and government check each other, but not in the same sense that the Judicial Branch checks the Executive Branch.").
[40] Fairfax, *supra* note 29, at 727.

to the executive, "[t]he grand jury may frustrate the [e]xecutive's efforts to prosecute an individual," and it "may exercise its discretion to send the [e]xecutive a message about its preferred allocation of law enforcement and prosecutorial resources."[41] With respect to the legislature, the grand jury "determin[es] when conduct that Congress has proscribed will be subject to criminal prosecution."[42] As such a powerful check on the government, the grand jury is meant to provide additional protection for the individual threatened by the government with a serious deprivation of his liberty.[43]

Finally, with the near disappearance of the jury trial,[44] the grand jury is the last vestige of the voice of the people in their criminal justice system.[45] When the grand jury returns a true bill, it conveys to the prosecutor, and the general public, the will of the people that the accused be compelled to answer the accusation(s) of criminal conduct.[46] A true bill returned by the grand jury affirms the people's belief in the appropriateness of the law being applied and the importance of holding the

---

[41] *Id.* at 728.
[42] *Id.*; *see also id.* ("Not only is the grand jury in a position to decline to allow a prosecution under a particular criminal statute, it also can influence the Executive to enforce criminal statutes it otherwise would not.").
[43] *See id.* at 729 ("[T]he grand jury, with its robust discretion, checks the judicial, executive, and legislative branches and represents a structural protection of individual rights [which are 'particularly subject to encroachment' in the criminal law].").
[44] *See Walker*, 2017 WL 2766452, at *9.
[45] *See In re Kittle*, 180 F. 946, 947 (S.D.N.Y. 1910) ("They are the voice of the community accusing its members, and the only protection from such accusation is in the conscience of that tribunal.").
[46] *See* Kuckes, *supra* note 30, at 1312 (referring to "the accusatory nature of the grand jury").

individual accountable for breaking it.[47] The grand jury indictment functions as a "democratic force within the prosecutorial function."[48]

Viewing the grand jury as an evidentiary gatekeeper, a powerful structural check on the government, and the voice of the people as an accusatory body reveals the multi-faceted importance that the grand jury brings to the criminal justice system. These functions are rarely given consideration in plea bargaining. Prosecutors ignore the grand jury's voice by negotiating plea deals that trade away numerous indicted charges in exchange for the defendant's guilty plea to an agreed charge. The prosecutor usually holds onto these indicted charges until he is assured of the defendant's conviction and sentence on the agreed charge. The plea bargaining prosecutor fails to recognize the voice of the people reflected in the true bill returned by the grand jury and simply uses the indicted charges as leverage to obtain a guilty plea to the charge(s) that he deems appropriate.

### c. The Importance of the Criminal Jury Trial

The second opportunity for the people's participation in their criminal justice system, which has been rendered virtually extinct by the bureaucracy that has taken over the system, is the criminal jury trial. There is substantial evidence that the criminal jury trial, viewed as the jury trial right, was considered exceptionally important by the Founders and during the first 150 years (or so) of the nation's history.

---

[47] *See id.* at 1307–08 (viewing "grand jury screening" "as a 'rough screening body guided by a community sense of justice'").
[48] *Id.* at 1309.

9

James Madison described the jury trial right thus:

> Trial by jury cannot be considered as a natural right, but a right resulting from a social compact which regulates the action of the community, but is as essential to secure the liberty of the people as any one of the pre-existent rights of nature.[49]

The Federal Farmer, echoing similar themes, described rights, including the jury trial right, thus:

> [S]ome [rights] are natural and unalienable, of which even the people cannot deprive individuals: Some are constitutional or fundamental; these cannot be altered or abolished by the oridinary laws; but the people, by express acts, may alter or abolish them—These, such as the trial by jury, . . . individuals claim under the solemn compacts of the people, as constitutions . . . .[50]

Although the jury trial right was not considered a natural right, in the act of constituting a new government, the people considered the jury trial right to be as important as those natural rights (e.g. life, liberty) that were explicitly reserved and protected from government power.

Juries were so important to the Founders that the Constitution mentions the jury trial right twice. Article III states: "The Trial of all Crimes . . . shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed . . . ."[51] The Sixth Amendment states: "In all criminal prosecutions, the

---

[49] Hamburger, *supra* note 22, at 920 n.42 (quoting James Madison, Speech in House of Representatives (June 8, 1789)).
[50] *Id.* (quoting "Federal Farmer" (Dec. 25, 1787)).
[51] U.S. Const. art. III, § 2, cl. 3.

accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."[52]

Reflecting the importance of the criminal jury trial, late nineteenth-century jurisprudence reveals that courts considered the jury trial right to be a collective right—a right of the people rather than merely a right of the accused. Justice Harlan, in tracing the American jury trial right to its historical roots in common law England and the Magna Carta, concluded "that when [the accused] committed the offense of grand larceny . . ., the supreme law of the land *required* that he should be tried by a jury composed of not less than twelve persons."[53] In the same opinion, Justice Harlan observed that

> it was not in the power of one accused of felony, by consent expressly given or by his silence, to authorize a jury of only eight persons to pass upon the question of his guilt. The law in force when this crime was committed did not permit any tribunal to deprive him of his liberty, except one constituted of a court and a jury of twelve persons.[54]

A few years earlier, the Supreme Court had aptly articulated the rationale for preventing an accused from waiving what were considered fundamental *aspects* of the jury trial right:

> We are of opinion that it was not within the power of the accused or his counsel to dispense with statutory requirement as to his personal presence at the trial. The argument to the contrary necessarily proceeds upon the ground that he alone is concerned as to the mode by which he may be deprived of his life or liberty, and that the chief object of the prosecution is to punish him for the crime charged. But this is a mistaken view as well of the relations

---

[52] U.S. Const. amend. VI.
[53] *Thompson v. Utah*, 170 U.S. 343, 350 (1898) (emphasis added).
[54] *Id.* at 353.

11

> which the accused holds to the public as of the end of human punishment. The natural life, says Blackstone, "cannot legally be disposed of or destroyed by an individual, neither by the person himself, nor by any other of his fellow creatures merely upon their own authority." The public has an interest in his life and liberty. Neither can be lawfully taken except in the mode prescribed by law. That which the law makes essential in proceedings involving the deprivation of life or liberty cannot be dispensed with, or affected by the consent of the accused . . . .[55]

Similarly, in 1909, the Sixth Circuit articulated a collective-right view of the jury trial right in *Low v. United States*.[56] The Sixth Circuit concluded that Article III required jury trials for criminal adjudications, i.e., adjudications that deprive an individual of his natural right to liberty, and that the Sixth Amendment articulates the *kind* of trial to which an accused was entitled.[57] Applying standard principles of statutory construction[58] to Article III supports the Sixth Circuit's view in *Low* that criminal jury trials are mandatory as a matter of constitutional law.[59] As one

---

[55] *Hopt v. Utah*, 110 U.S. 574, 579 (1884) (citation omitted).
[56] *Low v. United States*, 169 F. 86, 91 (6th Cir. 1909).
[57] *Id.* ("[The Sixth] amendment, as we historically know, originated in the earnest desire to secure, in a definitive way, the common-law procedure in criminal trials. Without unanswerable reasons it should not be construed as authorizing so grave a change in the constitutional tribunal of trial as would result if trial by jury may be waived at the option of the accused. The plain purpose of that amendment was to declare those rights appurtenant to jury trial which had from ancient times surrounded an accused. The rights and privileges so declared, says Judge Story, in his Commentaries on the Constitution, Sec. 1791, 'do but follow the established course of the common law.' The accused is not only to 'enjoy' jury trial, but a speedy trial and a public trial, by an impartial jury of the locality, be confronted by the witnesses against him, have compulsory process for his own witnesses, and, finally, the right to be assisted by counsel.").
[58] Specifically, the rule that "shall" is usually interpreted as mandatory. *See Murphy v. Smith*, 138 S. Ct. 784, 787 (2018).
[59] *See* Schehr, *supra* note 25, at 411; *see also Thompson*, 170 U.S. at 347–48 ("As the guaranty of a trial by jury, in the third article, implied a trial in that mode, and according to the settled rules of the common law, the enumeration, in the sixth amendment, of the rights of the accused in criminal prosecutions, is to be taken as a declaration of what those rules were, and is to be referred to the anxiety of the people of the states to have in the supreme law of the land, and so far as the agencies of the general government were concerned, a full and distinct recognition of those rules, as involving the fundamental rights of life, liberty, and property. This recognition was demanded and secured for the benefit of all the people of the United States, as well those permanently or temporarily residing in the

commentator claims, "[f]or Harlan and all previous Supreme Courts, published scholarship, and professional practice, Article III was the controlling stipulation when it came to jury trials."[60]

Many modern commentators have also interpreted the jury trial right as a collective right of the people. For example, Judge Stephanos Bibas concludes that "Article III is not phrased as a right belonging to the accused. It was meant to be a right of We the People to administer justice, not simply a right of defendants to waive (or be coerced into waiving)."[61] Laura Appleman interprets the jury trial right as a community right that "was heavily intertwined with a combined retributive and restorative understanding of punishment[,] . . . a philosophy closely tied to the sovereign will of the people."[62] Robert Schehr claims that "rights [including the jury trial right] are not solely the possession of an individual, they are cultural artifacts that must be preserved in order to firmly realize freedom."[63]

But, not far into the twentieth century, the Supreme Court changed course regarding the jury trial right. In *Patton v. United States*, Justice Sutherland, writing for the Court, concluded that "the Sixth Amendment usurped Article III because it is

---

District of Columbia as those residing or being in the several states. There is nothing in the history of the constitution or of the original amendments to justify the assertion that the people of this District may be lawfully deprived of the benefit of any of the constitutional guaranties of life, liberty, and property; especially of the privilege of trial by jury in criminal cases." (quoting *Callan v. Wilson*, 127 U.S. 540, 550 (1888)).
[60] Schehr, *supra* note 25, at 411.
[61] Stephanos Bibas, *Originalism and Formalism in Criminal Procedure: The Triumph of Justice Scalia, The Unlikely Friend of Criminal Defendants?*, 94 Geo. L.J. 183, 196–97 (2005).
[62] Laura I. Appleman, *Defending the Jury: Crime, Community, and the Constitution* 126–27 (Cambridge University Press 2015).
[63] Schehr, *supra* note 25, at 411.

a more recent amendment to the Constitution."[64] This decision marked an important change in how the Court viewed the jury trial right. Earlier jurisprudence generally viewed the jury trial right as something held by the public and something that protected the public's interest. The *Patton* decision began a shift toward viewing the jury trial right as something entirely within the control of the accused, meaning that the accused had the absolute discretion to determine whether to go to trial. This was partly in response to "a time of growing discontent with jury trials, attributable to increasing caseloads being forced upon prosecutors, defense attorneys, and the courts as a result of rising urban crime"[65] and the increasing complexity of criminal trials.[66]

> Stephen Siegel contends that the most important event giving rise to the *Patton* decision was the triumphant arrival of classical liberalism. By viewing defendants as *homo economicus*, "free agents" able to buy and sell goods in the judicial marketplace, the Court adopted a "creedal shift [that] encouraged judges and commentators to interpret constitutional rights as individual privileges rather than collective rights."[67]

Viewing the jury trial right as an individual privilege of the accused, the Court readily recognized the right as a bargaining chip in negotiations with the prosecutor in the early 1970s. The first case to explicitly legitimize the notion of adjudicating

---

[64] *Id.* at 412 (citing *Patton v. United States*, 281 U.S. 276, 298 (1930)).
[65] *Id. But see Walker*, 2017 WL 2766452, at *9–11 (demonstrating that the caseload and trial statistics from 1970 to 2016 do not support the conclusion that either the prosecutors or the courts are overworked).
[66] *See* Gerard E. Lynch, *Our Administrative System of Criminal Justice*, 66 Fordham L. Rev. 2117, 2142 (1998) ("Perhaps every criminal defendant could have a jury trial when jury trials were rougher and readier procedures, when most defendants did not have legal counsel, when the substantive law was simpler, and when defendants' procedural rights were rudimentary. But as the procedural complexity of the formal due process model increases, it becomes natural for the law to seek more efficient solutions, and over time such solutions have evolved into a de facto administrative system.").
[67] Schehr, *supra* note 25, at 412–13 (alteration in original) (footnote omitted) (quoting Stephen Siegel, *The Constitution on Trial: Article III's Jury Trial Provision, Originalism, and the Problem of Motivated Reasoning*, 52 Santa Clara L. Rev. 373, 427 (2012)).

14

criminal cases through a *bargaining* process between the prosecutor and the defendant came in *Brady v. United States*. There, the Court noted that "[i]t is this *mutuality of advantage* that perhaps explains the fact that at present well over three-fourths of the criminal convictions in this country rest on pleas of guilty."[68] An appeal to the concept of "mutuality of advantage" reduces criminal adjudication to *an economic transaction between marketplace actors.*

Just one year after *Brady*, the Court explicitly endorsed plea bargaining in *Santobello v. New York*.[69] There, the Court concluded that "[t]he disposition of criminal charges by agreement between the prosecutor and the accused, sometimes loosely called 'plea bargaining,' is an essential component of the administration of justice. *Properly administered, it is to be encouraged.*"[70] Most recently, "the [C]ourt [has] recognized for the first time that defendants have a legitimate interest in plea bargain offers that they would have accepted—and that courts would have approved."[71]

While there is a general approval of the practice of plea bargaining among the courts, this does not mean that every plea bargain should be accepted. The Fourth

---

[68] *Brady v. United States*, 397 U.S. 742, 752 (1970) (emphasis added).
[69] *Santobello v. New York*, 404 U.S. 257, 260 (1971).
[70] *Id.* (emphasis added); *see also id.* at 261 ("Disposition of charges after plea discussions is not only an essential part of the process but a highly desirable part for many reasons. It leads to prompt and largely final disposition of most criminal cases; it avoids much of the corrosive impact of enforced idleness during pre-trial confinement for those who are denied release pending trial; it protects the public from those accused persons who are prone to continue criminal conduct even while on pretrial release; and, by shortening the time between charge and disposition, it enhances whatever may be the rehabilitative prospects of the guilty when they are ultimately imprisoned.").
[71] Brian McNeill, *Brown: Supreme Court Recognizes Key Role of Plea Bargaining in Criminal Justice System*, University of Virginia School of Law News & Media (March 26, 2012), https://content.law.virginia.edu/news/2012_spr/plea_bargaining.htm (quoting Darryl Brown, University of Virginia Law Professor); *see also Missouri v. Frye*, 566 U.S. 134, 143–44 (2012).

15

Circuit has held that "each individual judge is free to decide whether, and to what degree, he will entertain plea bargains,"[72] and that "the district court ha[s] no duty to permit plea bargaining [and i]s not required to consider the substance of [the defendant's] agreement with the government."[73] Plea bargains generally implicate and negate the people's interest in participating in their government. I firmly believe that this interest, realized through both the grand jury and the jury trial, is still of paramount importance, even if it has not recently been praised as such by the courts.

Therefore, when I evaluate a particular plea bargain, I will start with the principle that the people have a supremely important interest in participating in their criminal justice system. That interest must be weighed against the interests and motivations of defendants and the government who have entered into a plea bargain. Appeals to efficiency and expediency rarely, if ever, will justify acceptance of a plea bargain. Thus, in the absence of compelling case-specific factors, it will be the exceptional case where I find that the people's interest in participating in the criminal justice system has been overcome.

### d. Weighing the Interests in This Case

Before me is a plea bargain that trades four counts of opioid drug dealing, one count of cocaine base drug dealing, and one count of firearm possession by a felon, all returned by the grand jury, for a guilty plea to a single count of distributing heroin. I am puzzled that, in the face of the government's explicit admission that it has no

---

[72] *United States v. Jackson*, 563 F.2d 1145, 1148 (4th Cir. 1977).
[73] *United States v. Stamey*, 569 F.2d 805, 806 (4th Cir. 1978).

evidentiary concerns in this case,[74] the government would abandon six of the seven grand jury charges.

The primary arguments advanced by the government in favor of the plea bargain in this case are generally applicable to every plea bargain and not case-specific. That is, the government points only to the standard justifications for plea bargaining. In the absence of any case-specific support for this capitulation on the bulk of indicted charges, I am left to conclude that this plea bargain is motivated by expediency and an abiding desire to avoid going to trial.

Since the decision in *Walker*, I have concluded that the government believes that leaving the judge with broad sentencing discretion is the only interest to be considered in accepting or rejecting a plea bargain. The government repeatedly emphasizes the defendant's cooperation with respect to drug amounts and Guideline enhancements.[75] Simply put, the government seems to think that all I care about is the length of the available Guideline sentence. Its premise is that if the defendant agrees to be incarcerated for what the government considers an appropriate amount of time, nothing else in the criminal justice process really matters. Why bother seeking an indictment from the grand jury if a defendant can be convinced to agree to plead guilty to an information? Why try to obtain convictions on other grand jury counts if the defendant admits the conduct qualifying as relevant under the Guidelines? Shouldn't the judge be completely satisfied? Why make the government

---

[74] Resp. of United States 10.
[75] *Id.* at 2, 4, 9.

prepare for and present its case at trial? Why make the government liable for defending against any appeal?[76]

The answer to these questions is central to the issue before the court, and simple: The United States criminal justice system is about far more than just punishment, and it was never intended to place all the power of accuser, judge, and jury into the hands of the government. Criminal justice in this country was meant to be a balanced system that regulates the investigation, formal accusation, adjudication of guilt and innocence, and punishment of crimes. All aspects of this system were carefully considered and debated by the Founders to ultimately be memorialized for their fundamental value in our Constitution.[77]

The Founders clearly intended and articulated a preeminent role for the people's direct participation in that criminal justice system. I do not see *justice* in the plea agreement proffered in this case. As with most plea bargains, it eliminates the people's participation entirely on the reasoning that the people have "an interest in the efficient and effective adjudication of criminal cases,"[78] and that is good enough. Plea bargains like this one perpetuate the ongoing metamorphasis of the criminal justice system into nothing more than an administrative system controlled entirely by bureaucrats,[79] where judge and jury are merely stage props to convince the general

---

[76] One commentator has found the presence of appeal waivers in two thirds of plea agreements, although precise numbers vary greatly by circuit. Nancy J. King & Michael E. O'Neill, *Appeal Waivers and the Future of Sentencing Policy*, 55 Duke L.J. 209, 212 (2005). In this district, extensive waivers of appellate rights by the defendant are a part of the government's standard plea agreement.

[77] Four of the ten Amendments contained in the Bill of Rights regulate the investigation, accusation, trial, and punishment of criminal conduct. *See* U.S. Const. amends. IV, V, VI, VIII.

[78] Resp. of United States 4.

[79] It is acknowledged that the grand jury is largely the tool of the prosecutor; that guilty pleas, often the result of carefully-negotiated

18

public that the criminal justice system they see nightly on television is being busily played out in the big courtroom downtown.

## IV. CONCLUSION

Because I have concluded that the parties have not overcome the weighty interest of the people in participating in their criminal justice system, and because the plea bargain in this case reflects an agreement which erodes that interest without a compelling, case-specific reason beyond mere expediency, I **REJECT** the plea agreement. The court further DIRECTS the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER: April 12, 2018

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

---

plea bargains, dispose of far more cases than are tried; that those bargains, sometimes in combination with sentencing guideline systems, often dictate the sentence to be imposed on the defendant. It is recognized, almost as an aside, that in cases disposed of without trial there is no jury at all, no witnesses appear for cross-examination, such factual information as the judge receives beyond the defendant's own acknowledgment of guilt—and there may be none—will likely be presented in written summary rather than in oral form. And most importantly, the only real assessment by the institutions of justice of whether the accused is actually guilty of the offense charged is made by the police and prosecutor, not by the (absent) jury or by the judge (who simply accepts the voluntary and intelligent decision of the defendant to waive trial).

. . . [F]or most defendants the primary adjudication they receive is, in fact, an administrative decision by a state functionary, the prosecutor, who acts essentially in an inquisitorial mode.

Lynch, *supra* note 66, at 2120 (emphasis added).